NICHOLS KASTER, LLP
Matthew C. Helland, CA Bar No. 250451
helland@nka.com
One Embarcadero Center, Suite 720
San Francisco, CA 94111
Phone: (415) 277-7235
Fax: (415) 277-7238

NICHOLS KASTER, PLLP
E. Michelle Drake, MN Bar No. 0387366*
drake@nka.com
Megan D. Yelle, MN Bar No. 0390870*
myelle@nka.com
John G. Albanese, MN Bar No. 0395882*
jalbanese@nka.com
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878

GOTTLIEB & ASSOCIATES
Jeffrey M. Gottlieb, NY Bar No. JG-7905*
nyjg@aol.com
Dana L. Gottlieb, NY Bar No. DG-6151*
danalgottlieb@aol.com
150 East 18th Street, Suite PHR
New York, NY 10003
Phone: (212) 228-9795
Fax: (212) 982-6284
*admitted *pro hac vice*
Attorneys for Individual and Representative Plaintiffs

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN HEATON, and ANNA AHLBORN, individually, as representatives of the classes, and on behalf of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>SOCIAL FINANCE, INC. and SOFI LENDING CORP.,<br><br>Defendants. | Case No.:3:14-cv-05191-TEH<br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [REDACTED VERSION]**<br>Date: October 19, 2015<br>Time:10:00 AM<br>Courtroom: 12<br>Judge: Thelton E. Henderson<br>Complaint Filed: Nov. 24, 2014 |

## **TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................1

II. STATEMENT OF FACTS .....................................................................3, 4

    A.  *Plaintiff Heaton's Experience on Defendants' Website* ...............3, 4

    B.  *Plaintiff Ahlborn's Experience on Defendants' Website* ..............5, 6

    C.  *Plaintiffs and Other Consumers Complained to Defendants About Hard Credit Pulls Being Done* ....................................................7

III. PROCEDURAL HISTORY ....................................................................8

IV. LEGAL STANDARD ...........................................................................9

V.  ARGUMENT ......................................................................................10

    A.  *Defendants Did Not Have a Permissible Purpose to do a Hard Pull on Plaintiffs' Credit* ......................................................................10

        i.   Plaintiffs did not give written instructions authorizing Defendants to do a hard credit pull .................................................11

        ii.  Plaintiffs did not initiate a credit transaction with Defendants .....12

        iii. "Soft Inquiry Only" was a material terms of any transaction .......14

    B.  *Defendants Violated the FCRA and the CCRA By Obtaining Consumer Information Under False Pretenses* ..............................17

    C.  *The Issue of Willfulness Should Not Be Decided Now – on a Partial Record, at Summary Judgment* ....................................18, 19

        i.   The evidence in the record shows that Defendants' violations were knowing ...........................................................................20

        ii.  Defendants did not have a reasonable interpretation of the FCRA that allowed their behavior .................................................22

        iii. At a minimum, the Court should not decide the issue of willfulness without allowing for additional discovery ......................24

    D.  *Social Finance Cannot Escape Liability Simply Because SoFi Lending*

-i-

*Signed the Contract with Experian* .........................................25

E.   *Defendants Violated the California Unfair Competition Law* ..............26, 27

i.   Plaintiffs have standing to bring UCL claims ...........................27

ii.  Defendants' misrepresentations constitute an unfair, fraudulent, and/or unlawful business practice ...........................29

VI.  CONCLUSION ...........................................30

## TABLE OF AUTHORITIES

Cases

*Alborzian v. JPMorgan Chase Bank, N.A.*, 185 Cal. Rptr. 3d 84 (Cal. Ct. App. 2015) ....28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................9

*Berryman v. Merit Prop. Mgm't, Inc.*, 152 Cal. App. 4th 1544 (2007) ...........................27

*Boschma v. Home Loan Ctr.*, 198 Cal. App. 4th 230 (2011) ..................................27, 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................9

*Cel-Tech Comms., Inc. v. Los Angeles Cell. Tele. Co.*, 20 Cal. 4th 163 (Cal. 1999) ..........30

*Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir. 1992) ....................................24

*Claffey v. River Oaks Hyundai, Inc.*, 494 F. Supp. 2d 976 (N.D. Ill. 2007) ................3, 23

*Colgan v. Leatherman Tool Grp.*, 135 Cal. App.4th 663 (2006) ...................................29

*Daley v. Haddonfield Lumber Inc.*, 943 F. Supp. 464 (D.N.J. 1996) ..............................25

*Dampf v. BAC Home Loans Servicing, L.P.*, 2014 WL 5369782 (Cal. Ct. App. Oct. 22, 2014) ..................................................................................................................28

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247 (2010) .......................30

*Dunford v. Am. DataBank, LLC*, 64 F. Supp. 3d 1378 (N.D. Cal. 2014) ................3, 22, 24

*Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197 (C.D. Cal. 2007) ................................20

*In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) .....................................27

*Haley v. TalentWise, Inc.*, No. 13-cv-1915, 2014 WL 1648480 (W.D. Wash. Apr. 23, 2014) ..................................................................................................................23

*Hansen v. Morgan*, 582 F.2d 1214 (9th Cir. 1978) ...................................................17

*Harris v. Home Depot U.S.A., Inc.*, No. 15-CV-01058-VC, 2015 WL 4270313 (N.D. Cal. June 30, 2015) ........................................................................................................13

*Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107 (9th Cir. 2003) ..........................20

*Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161 (E.D. Cal. 2013) .......................27, 29

*Holman v. Experian Info. Solutions, Inc.*, 2013 WL 4873496 (N.D. Cal. Sept. 12, 2013) ........................................................................................................3, 19

*InterPetrol Bermuda Ltd. v. Kaiser Alum. Int'l Corp.*, 719 F.2d 992 (9th Cir. 1983) .......15

*Kennedy v. Border City Sav. & Loan Ass'n*, 747 F.2d 367 (6th Cir. 1984) ....................17

*Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) ..............................28

*Lengel v. HomeAdvisor, Inc.*, ___ F. Supp. 3d. ___, 2015 WL 2088933 (D. Kan. May 6, 2015) ..........................................................................19

*Manuel v. Wells Fargo Bank, Nat. Ass'n*, 2015 WL 4994538 (E.D. Va. Aug. 19, 2015) ...........................................................3, 20, 23

*Margolis v. Ryan*, 140 F.3d 850 (9th Cir. 1998) ........................................9

*Morgan v. AT&T Wireless Srvs, Inc.*, 177 Cal. App. 4th 1235 (2009) ...............29

*Newlin v. Comcast Cable of Ind., Inc.*, 2014 WL 1207513 (N.D. Ind. Mar. 24, 2014) ......16

*Pappas v. City of Calumet City*, 9 F. Supp. 2d 943 (N.D. Ill. 1998) .................18

*Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909 (N.D. Cal. 2013) .....................27

*Rex v. Chase Home Fin. LLC*, 905 F. Supp. 2d 1111 (C.D. Cal. 2012) .................28

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir. 2010) ........................28

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) ...........................3, 19, 22

*Saucier v. Katz*, 633 U.S. 194 (2001) ....................................3, 19

*Scott v. Real Estate Fin. Grp*, 183 F.3d 97 (2nd Cir. 1999) ................14, 15, 25

*S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978) ....................26

*Singleton v. Domino's Pizza, LLC*, No. 11-cv1823, 2012 WL 245965 (D. Md. Jan. 25, 2012) ..............................................................................23

*Smith v. LexisNexis Screening Sols, Inc.*, 2014 WL 7403890 (E.D. Mich. Dec. 30, 2014) .20

*Starkey v. Experian Info. Sols, Inc.*, 2014 WL 3809196 (C.D. Cal. Jan. 8, 2014) ..........20

*Uhlig v. Berge Ford Inc.*, 257 F. Supp. 2d 1228 (D. Ariz. 2003) ...................15

*U.S. v. Bilzerian*, 926 F.2d 1285 (2nd Cir. 1991) .............................24

*Velasquez v. Chase Home Fin. LLC*, 2010 WL 3211905 (N.D. Cal. Aug. 12, 2010) .......28

*Venugopal v. Digital Fed. Credit Union*, 2013 WL 1283436 (N.D. Cal. Mar. 27, 2013) ..28

*White v. Trans Union, LLC*, 462 F. Supp. 2d 1079 (C.D. Cal. 2006) ..................28

-iv-

*Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967 (4th Cir. 1987) .17

*Zamora v. Valley Fed. Sav. & Loan Ass'n*, 811 F.2d 1368 (10th Cir. 1987) ........................17

Rules & Statutes

15 U.S.C. § 1681, *et seq.* ...........................................................................................*passim*

Cal. Bus. & Prof. Code § 17204 ....................................................................26, 27, 28, 29, 30

Cal Civ. Code § 1785, *et seq.* ......................................................................................*passim*

Fed. R. Civ. P. 56, *et seq.* ...................................................................................9, 22, 25

Other Authority

*Black's Law Dictionary* (10th ed. 2014) ..............................................................................28

*Letter from David Medine to Karen Coffey*, 1998 WL 34323748 (FTC Informal Staff Ltr.

Feb. 11, 1998) ..................................................................................................2, 10, 13

1    **I.**      **INTRODUCTION**

2            Plaintiffs, like millions of Americans, have student loan debt subject to extremely

3    high interest rates.   Lured by the promise of lower interest rates, Plaintiffs visited

4    Defendants' website, www.sofi.com.   Defendants' website referenced the prospect of a

5    credit inquiry, but *every time* the website referenced a credit inquiry, the website also

6    explicitly promised Plaintiffs that the "inquiry will not affect your credit score."[1]   Despite

7    Defendants' explicit representation that the credit inquiry done as part of the loan process

8    "will not affect your credit score," Defendants initiated both a "soft" credit inquiry, which

9    did not affect Plaintiffs' credit scores, and a "hard" credit inquiry which *did* affect

10   Plaintiffs' scores.   Defendants have done the same thing to scores of other consumers.

11          Defendants knowingly initiated the hard credit inquiry without a permissible

12   purpose for doing so, in violation of the Fair Credit Reporting Act ("FCRA") and the

13   California Credit Reporting Agencies Act ("CCRAA").   *See* generally 15 U.S.C. § 1681b.

14   Despite their blatant and intentional misrepresentations, Defendants would have this Court

15   believe that the FCRA and the CCRAA – statutes enacted with the stated purpose of

16   protecting consumer privacy – allow their fraudulent conduct.   Defendants are wrong for

17   at least three reasons.

18          First, Plaintiffs did not consent to Defendants' credit inquiry.   Defendants' efforts

19   to rely on the vague language of their so-called "credit disclosure" as authorizing a hard

20   credit inquiry is unavailing.   The indefensibility of Defendants' position is revealed by

21   simply looking at the actual web page on which the disclosure is found -- the *very same*

22   *screen* which displays the credit disclosure also *explicitly promises* that the inquiry

23   referenced therein will "not affect" the consumer's credit score.   (*See* Declaration of June

24

25

26   _____

27   [1] The version viewed by Plaintiff Ahlborn was written in the first person and stated "This is non-binding and will not affect my credit score."

28

-1-

Ou ("Ou Decl.") ¶¶ 9-10, 16-17, 27, Exs. F, G, I, S.[2])  Before Plaintiffs got to the credit disclosure on which Defendants rely, they had each been told no fewer than *five* times that Defendants' inquiry would "not affect your credit score."  (Ou Decl. ¶¶ 8, 27, Exs. D, R.)  Moreover, Defendants' website explicitly categorized the credit inquiry as "soft."  Any reasonable consumer would have interpreted the authorization to mean just what it said: that Plaintiffs were consenting to allow Defendants to perform a "soft pull" which is the only kind of inquiry that does "not affect your credit score."

Second, Defendants did not have a legitimate business need for the information in connection with a transaction initiated by the consumer.  Defendants argue that, even absent Plaintiffs' consent, Defendants were entitled to perform a hard credit inquiry because Plaintiffs "initiated a credit transaction" with Defendants.  (*See* Defs.' Br. at 13-15, ECF No. 73.)  This claim is flawed, both factually and legally.  As a factual matter, Plaintiffs' clicks on Defendants' website were insufficient to meet the high bar for "initiating a credit transaction" set by the FCRA.[3]  From a legal perspective, Defendants fail to meet the additional requirement that their need for the credit report was "legitimate" in the context of any alleged transaction.  *See* Coffey Letter (stating that *both* a consumer-initiated transaction *and* a legitimate purpose for the inquiry must exist).  While the FCRA authorizes creditors to obtain credit reports when consumers initiate credit transactions, it only does so in the absence of a contrary agreement by the parties.  Where the inquiring party promises that the credit inquiry "will not affect your credit score" and explicitly obtains authorization for a soft inquiry only, as Defendants did here,

---

[2] Cites herein to the Ou Decl. and the Ou Decl. Exhibits refer to the September 11, 2015 Ou Declaration and Exhibits filed at ECF No. 77 by Defendants in support of their Motion for Summary Judgment.

[3] The FTC has opined that for a credit pull to be justified in such an instance, the consumer must be engaged in more than mere shopping behavior.  *Letter from David Medine to Karen Coffey*, 1998 WL 34323748 (FTC Informal Staff Ltr. Feb. 11, 1998) ("Coffey Letter") ("[A] request for general information about products and prices offered does not involve a business transaction initiated by the consumer.").

-2-

then there is no *legitimate* business purpose to conduct a hard inquiry.  Far from licensing

Defendants' conduct, the FCRA explicitly *forbids* creditors from obtaining reports under

false pretenses, as Defendants did here.  *See* 15 U.S.C. § 1681q.

Third, Defendants' conduct was willful within the meaning of the FCRA.

Knowing violations are willful, as are reckless violations.[4]  *See Safeco Ins. Co. of Am. v.*

*Burr*, 551 U.S. 47, 57 (2007).   The undisputed evidence shows that Defendants'

misrepresentations were knowing, and therefore willful.  *See infra* at § V.C.i.  Defendants

cannot escape liability for a reckless violation by showing reliance on an objectively

reasonable statutory interpretation, because they have not shown that they *had* a pre-

litigation interpretation of the FCRA.[5]   Instead, they have asserted attorney-client

privilege while failing to produce a privilege log.  Even if Defendants could show they

had a pre-litigation interpretation of the FCRA which licensed their conduct, any such

interpretation would be unreasonable.  The FCRA and the CCRAA simply do not allow

creditors to affirmatively mislead consumers, any interpretation to the contrary is wrong.

**II.**   **STATEMENT OF FACTS**

> ***A.***   ***Plaintiff Heaton's Experience on Defendants' Website.[6]***

---

[4] Defendants' efforts to claim qualified immunity also fail.  Plaintiffs are not required to demonstrate liability by relying on factually similar cases from binding appellate courts. In fact, courts in this District have explicitly rejected the idea that the standard for willful conduct under the FCRA mirrors qualified immunity.  *See Holman v. Experian Info. Solutions, Inc.*, 2013 WL 4873496, at *6 (N.D. Cal. Sept. 12, 2013) ("Defendant overstates the *Safeco* Court's reliance on qualified immunity analysis.  Indeed, the *Safeco* Court only mentions qualified immunity once, in a parenthetical to a citation introduced by 'Cf.'  See *Safeco,* 551 U.S. at 70 (citing *Saucier v. Katz*, 633 U.S. 194 (2001)).").

[5] *See Dunford v. Am. DataBank, LLC*, 64 F. Supp. 3d 1378, 1394-95 (N.D. Cal. 2014); *Manuel v. Wells Fargo Bank, Nat. Ass'n*, 2015 WL 4994538, at *18 (E.D. Va. Aug. 19, 2015); *Claffey v. River Oaks Hyundai, Inc.*, 494 F. Supp. 2d 976, 978-79 (N.D. Ill. 2007) (all holding that a defendant must show it actually had a pre-litigation reading of the FCRA in order to escape a willfulness finding based on that interpretation).

[6] Plaintiffs understand that presenting screens from a website, particularly a website that has changed over time, to the Court in a cogent manner is a difficult task.  The Ou Declaration presents the screens in non-sequential order, and interspersed with internal data that Plaintiffs never saw.  In an effort to make it easier for the Court to view the pages as Plaintiffs would have seen them, Plaintiffs have reorganized the Exhibits

1    Before conducting a hard pull on Plaintiff Heaton's credit, Defendants repeatedly

2    told Plaintiff Heaton that any credit inquiry they performed "will not affect your credit

3    score."   Plaintiff Heaton first encountered this message at the top of the four screens

4    Defendants refer to as the "registration pages."   At the top of each screen, Defendants

5    stated, "Filling out the registration will not impact your credit report."  (Ou Decl. ¶ 8, Ex.

6    D.)  After Plaintiff Heaton registered on the website, he encountered a page labeled "Step

7    1 > Student Loan Eligibility" which Defendants refer to as the "consents" page.  (Ou

8    Decl. ¶¶ 9, 10, Exs. F, G.)  The phrase "This inquiry will not affect your credit score"

9    appeared twice on this page, once immediately after Heaton entered his social security

10   number, and again immediately above the arrow he would have had to click to view the

11   credit disclosure.  (*Id.*)  The phrase "Soft Pull Authorization and Final Submit" appeared

12   above the checkbox Heaton clicked.  (*Id.*)  Next to the checkbox, the page stated, "I/we

13   understand that this is an eligibility inquiry for credit and authorize SoFi to obtain credit

14   information from a credit reporting agency for purposes of this eligibility inquiry."  (*Id.*)

15   It appeared as follows (red boxes added) (Ou Decl. Ex. F):

16

17

18

19

20

21

22

23   Immediately after Heaton encountered this page, Defendants did a soft pull on

24

25   attached to the Ou Declaration in the order that each Plaintiff would have seen the pages.

26   Plaintiffs have also prepared a summary table that shows which paragraph of the Ou

     Declaration discusses each of the Exhibits, and that contains all the text from each page

27   that pertains, in any way, to Defendants' procurement of consumer reports.  (*See*

     Declaration of Megan D. Yelle ("Yelle Decl.") Exs. 1-3.)

28

PLFS.' OPPOSITION TO MTN. FOR SUMMARY JUDGMENT
Case No. 3:14-cv-05191-TEH

Heaton's credit. (Ou Decl. ¶ 13.) Heaton proceeded from the Step 1 page for student loan refinancing back to Defendants' "home" page. (Ou Decl. Ex E.) From that page, Heaton proceeded to the Step 1 page for personal loan products, which was virtually identical to the Step 1 consent page he viewed for student loan refinancing.[7] (Ou Decl. ¶¶ 16-17, Ex. I.) Again, it told him twice that any credit inquiry "would not affect" his credit score, and referred only to a soft inquiry. (Ou Decl. Ex. I.)

Because they had already done a soft pull only moments before, Defendants did not do a second soft pull of Heaton's credit after he completed this page. (Ou Decl. ¶ 18.) Heaton was next presented with a screen labeled "Step 2 > Select an Amount" which contained the pre-filled amount of $10,000, and displayed partial terms for both three and five year loans. (Ou Decl. ¶¶ 16-21, Ex. L.) The three year loan option was pre-selected when Heaton viewed the page. (Ou Decl. ¶ 21.) In order to see more information about what Defendants were offering, Heaton was invited to select one of the loan terms by clicking the phrase "request amount." (Ou Decl. ¶¶ 16-21, Exs. J-L.) When Heaton clicked on the phrase "request amount' on the page represented by Ou Decl. Ex. L, Defendants performed a hard pull on his credit report. (Ou Decl. ¶ 23.) According to Defendants' internal records, only ▮ minutes elapsed between the time when Heaton clicked the checkbox on the page represented by Ou Decl. Ex. I (agreeing to a "soft pull" that would "not affect" his credit report) and the time that Defendants conducted a hard pull on his credit. (Ou Decl. Ex. A.) At no time was Heaton presented with any information which would lead him, or any reasonable consumer, to understand Defendants would do a hard credit pull that would affect his credit.

### B.   *Plaintiff Ahlborn's Experience on Defendant's Website.*

Like Heaton, Plaintiff Ahlborn was first asked to register on Defendants' website

---

[7] Instead of stating "Step 1 > Student Loan Eligibility," this page stated "Step 1 > Personal Loan Eligibility." Instead of stating "Soft Pull Authorization and Final Submit" next to the checkbox, this page stated "Soft Pull Authorization, Use of Proceeds and Final Submit." (Ou Decl. ¶¶ 16-17, Ex. I.) These differences are immaterial.

1    and was shown four separate registration screens.  At the top of each of these registration

2    screens it stated, "Checking your rate options will not affect your credit score."  (Ou Decl.

3    Ex. R.)  On the final registration screen, in addition to the phrase above appearing at the

4    top of the screen, language at the bottom of the screen asked Ahlborn to indicate her

5    consent, by clicking on a checkbox, which Defendants called a "Soft Credit Inquiry and

6    Income Verification."  (Ou Decl. Ex. S.)  Directly above the checkbox, the phrase "[t]his

7    is non-binding and will not affect my credit score" appeared.  (*Id.*)  The screen appeared

8    as follows (red box added) (Ou Decl. Ex. S):



13   After consenting to a "Soft Credit Inquiry" and clicking on the "Continue" button

14   at the bottom of the page, Ahlborn was taken to the home page where she chose to look at

15   loan options for student loan refinancing.  (Ou Decl. ¶ 29.)  After choosing to shop for

16   student loan refinancing products, Ahlborn was shown a pop-up screen which asked her to

17   input her "Total Loan Amount," stating "[t]his number should reflect the total outstanding

18   balance of your existing student loans even if you are only considering refinancing a

19   fraction of this debt."  (Ou Decl. Ex. U.)  Ahlborn completed the screen by entering her

20   total loan amount and clicked on the "Start" button.  (Ou Decl. ¶ 30.)  When Ahlborn

21   clicked on this button, Defendants did a soft pull on Ahlborn's credit.  (*Id.*)

22   After entering her loan amount, Ahlborn was shown a screen labeled "Step 1 >

23   Select a Product."  (Ou Decl. Ex. V.)  At the top of the screen it stated "Choose your

24   product now, or you can choose your product later."  (*Id.*)  This screen showed partial loan

25   terms for four different loan products.  The 5-year fixed loan product was pre-selected.

26   (Jt. Stmt. of Undisp. Mat. Facts at ¶ 17, ECF No. 75.)  Immediately above the partial loan

27   terms, language appeared stating, "[s]elect one of the below products to see how much

28

-6-

you would save with a SoFi loan.  The rates shown below are the range of potential rates depending on your credit profile.  Your actual rate depends upon credit score, loan amount, loan term, and credit usage & history."  (Ou Decl. Ex. V.)  Ahlborn did not change the pre-selected loan option and clicked on either the "Choose Now" or "Choose Later" button at the bottom of the screen.  (Ou Decl. ¶ 34.)  Unbeknownst to Ahlborn, when she clicked on the "Choose Now" or "Choose Later" button, Defendants did a hard credit pull on her credit report.  (*Id*.)

According to Defendants' internal records, only █ minutes elapsed between the time when Ahlborn clicked the checkbox on Ou Decl. Ex. S (agreeing to a "soft inquiry" that would "not affect" her credit report) and the time that Defendants conducted a hard pull on her credit.  (Ou Decl. Ex. P.)  At no time was Ahlborn presented with any information which would lead her, or any reasonable consumer, to understand Defendants would do a hard credit pull that would affect her credit.

### C.     Plaintiffs and Other Consumers Complained to Defendants About Hard Credit Pulls Being Done.

Plaintiff Heaton immediately realized that Defendants had done a hard inquiry on his credit report when he checked his Experian credit report and saw that Defendants had done both a soft credit inquiry and a hard credit inquiry on the same day.  (*See* SAC ¶ 69, ECF No. 65; Ou Decl. Ex. A.)  After seeing the improper credit inquiry, Heaton immediately contacted Defendants to inquire as to why the hard pull was appearing on his credit report.  (*See* SAC ¶ 73; Ou Decl. Ex. A.)  Heaton asked Defendants to contact Experian to have the hard credit inquiry removed from his credit report as he had only consented to a soft credit inquiry.  (*Id.*)  Defendants refused to do so.  (*Id.*)  Heaton also contacted Experian and asked them to remove the hard credit inquiry.  (*See* SAC ¶ 76-78, Ex. L.)  Experian later informed Heaton that they could not remove the inquiry because it was based on Defendants' representation that the hard inquiry had been done for a permissible purpose.  (*Id.*)  Frustrated with Defendants' lack of concern, Heaton filed a complaint against Defendants with the Better Business Bureau ("BBB") on July 9, 2014.

1   (*See* SAC ¶ 78, Ex. K.)   Defendants responded to Heaton's complaint only after this

2   lawsuit was filed by saying that it was "under review."  (*See* Yelle Decl. Ex. 4.)

3         Plaintiff Ahlborn did not realize that Defendants had done a hard inquiry on her

4   credit report until she received an adverse action notice from Defendants via email on July

5   7, 2014.  (*See* SAC ¶ 98, 101; Ou Decl. Ex. AD.)  After receiving the notice, Ahlborn

6   called Defendants to ask why she received the notice when she had never applied for a

7   loan with Defendants.  (*See* SAC ¶ 101, Ex. M.)  It was during this conversation that

8   Ahlborn learned that a hard pull had been done on her credit.  (*Id.*)  Ahlborn asked

9   Defendants to remove the hard pull from her credit report as she had only proceeded with

10  the loan shopping process because she believed that only a soft credit pull would be done.

11  (*Id.*)  Defendants refused.  Like Heaton, Ahlborn filed a complaint with the BBB on July

12  9, 2014.  (*See* SAC ¶ 105, Ex. M.)  Defendants did not respond to her complaint until

13  August 27, 2014.  (*See* SAC ¶ 106; Yelle Decl. Ex. 20.)

14        Numerous other consumers have contacted Defendants and the BBB to complain

15  about the fact that Defendants do a hard credit pull despite their representations that they

16  will only do a soft credit pull.  (*See* SAC Ex. K, Yelle Decl. Ex. 5 (illustrating at least 19

17  different complaints.)  Rather than using consumer feedback to clarify the representations

18  on their website, Defendants viewed the complaints as bothersome and annoying.  (*See*

19  Yelle Decl. Ex. 5 at SOFI-0001247-8, Ex. 6 (multiple examples of Defendants' staff

20  taking issue with having to respond to complaints).)  In fact, after Defendants' BBB

21  membership was suspended for failing to respond to consumer complaints, Defendants

22  decided to discontinue their BBB membership rather than address consumers' concerns.

23  (*See* Yelle Decl. Ex. 7.)

24  **III.    PROCEDURAL HISTORY**

25        Defendants' recitation of the procedural history of this case underscores the central

26  premise on which Plaintiffs' claims are based – Defendants withheld relevant and material

27  information regarding precisely when in the loan shopping process Defendants conducted

28

1    unauthorized hard credit inquiries.  When Plaintiff Heaton filed his initial Complaint, he

2    knew that he had only given his consent to run a soft credit inquiry, that Experian was

3    reporting that Social Finance had done both a soft pull and a hard pull on his credit on the

4    same date, July 9, 2014, and that Credit One had subsequently denied his request for a

5    credit card due, in part, to his having "too many recent inquiries."   After filing his

6    Complaint, and during the course of discovery in this case, Plaintiff Heaton was provided

7    with additional information which caused him to amend his Complaint so as to conform to

8    the new evidence he had received.

9        Plaintiffs have been diligent in amending the operative complaint to conform to

10   the facts as revealed in discovery.  Defendants would use this diligence to try to impugn

11   Plaintiffs' case, claiming that the SAC "(almost) completely shifted the focus of the case."

12   (Defs.' Br. at 9.)  This characterization is inaccurate.  The central allegation of Plaintiffs'

13   SAC remains the same today as when the original Complaint was filed—Defendants told

14   Plaintiffs they would only pull credit in such a way as to "not affect [their] credit score"

15   but, contrary to this explicit representation, Defendants did hard credit inquiries.  Each of

16   the amendments has been made in an effort to make the allegations in the operative

17   complaint conform to the evidence.  Characterizing the amendments in any other way is

18   misleading.

19   **IV.    <u>LEGAL STANDARD</u>**

20       Summary judgment is proper where the pleadings and evidence demonstrate that

21   "there is no genuine issue as to any material fact and … the movant is entitled to judgment

22   as a matter of law."  Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

23   (1986).  There is a genuine issue "if the evidence is such that a reasonable jury could

24   return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

25   248 (1986).  Where the non-moving party demonstrates a need for further discovery in

26   order to support its opposition to the motion, the court may deny the motion or continue

27   the hearing to allow for such discovery.  *See* Fed. R. Civ. P. 56(d); *Margolis v. Ryan*, 140

28

-9-

1  F.3d 850, 853 (9th Cir. 1998).

2  **V.  ARGUMENT**

3      *A.    Defendants Did Not Have a Permissible Purpose to do a Hard Pull on*
4             *Plaintiffs' Credit.*

5          The issue in this case is whether Defendants had a "permissible purpose" to

6  procure Plaintiffs' credit reports on a hard inquiry basis.[8]  There are a limited number of

7  permissible purposes available under the FCRA, two of which are relevant here.

8  Specifically, the FCRA allows hard inquiries:

9          (a) . . . (2)  In accordance with the written instructions of the consumer to
           whom it relates.

10             (3)  To a person which it has reason to believe - -

11                 (A)  Intends to use the information in connection with a
12                 credit transaction involving the consumer on whom the
                   information is to be furnished and involving the extension
13                 of credit to, or review or collection of an account of, the
                   consumer; . . .

14  15 U.S.C. §§ 1681b(a)(2), (3)(A).  In all instances, the FCRA requires that the creditor's

15  need for the credit information also be "legitimate."  *See* 15 U.S.C. § 1681b(a)(3)(F)

16  (referring to any circumstance in which the user "*otherwise* has a legitimate business

17  need" for the information.) (emphasis added).  *See also* Coffey Letter.  In short, the FCRA

18  limits hard credit pulls to[9]:

19             (1) circumstances in which the consumer has given written instructions

20  _____

21  [8] Defendants wrongly argue that Plaintiffs' claims are based entirely on the theory "that a
    lender cannot procure a credit report on a consumer until the consumer has *completed* the
22  lender's loan application."  (Defs.' Br. at 1.)  This attempt to re-frame the issues in this
    case is misguided.  The fact that neither Plaintiff actually completed Defendants' loan
23  application is simply one of many pieces of evidence supporting Plaintiffs' argument that
    Plaintiffs never gave Defendants written instructions allowing a credit pull and that
24  Plaintiffs never initiated a credit transaction with Defendants for which Defendants had a
    legitimate business need for the credit inquiry.
25  [9] The FCRA allows soft pulls for a broader category of events, including circumstances in
    which a lender is considering prequalification but has not received written instructions
26  from the consumer and in which the consumer is shopping but has not initiated a
    transaction.  *See* 15 U.S.C. § 1681b(a)(3)(F).
27

28                                    -10-

authorizing the pull, *see* § 1681b(a)(2); or

(2) credit transactions which were initiated by the consumer and in relation to which the creditor has a legitimate business need for the information, *see* §§ 1681b(a)(3)(A), (a)(3)(F), (c)(3).

The CCRAA has identical provisions which appear in Cal. Civil Code § 1785.19.

>           i.   <u>Plaintiffs did not give written instructions authorizing Defendants to do a hard credit pull.</u>

Defendants' argument that Plaintiffs gave written instructions consenting to hard credit inquiries fails.  The screens that contain the purported consents also explicitly state that the inquiries "will not affect your credit score" and refer exclusively to "soft" inquiries.  (Ou Decl. ¶¶ 9-10, 16-17, 27, Exs. F, G, I, S.)  Tellingly, Defendants' brief cites to only a *portion* of the credit disclosure that appeared on their website and disingenuously fails to include the relevant language immediately preceding the disclosure.  (*Id.*)  The credit disclosure language quoted by Defendants falls immediately below language stating either "This inquiry will not affect your credit score" in the case of Plaintiff Heaton or "This is non-binding and will not affect my credit score" in the case of Plaintiff Ahlborn.  (Ou Decl. ¶¶ 16-17, Exs. G, S.)

Any reasonable consumer upon first reading the phrase "will not affect your credit score" and then seeing the credit disclosure, would logically conclude that the credit disclosure language referring to a credit inquiry is referencing the same soft credit inquiry that is promised to "not affect your credit score" directly above the disclosure.  The language of the credit disclosure itself supports this view.  The disclosure states that the consumer is authorizing Defendants "***today*** for purposes of ***this loan application***…" to obtain a credit report on the consumer.  (Ou Decl. ¶ 16-17, Exs. G, S.)  The words "today" and "this loan application" both indicate the consent is for the entirety of any credit inquiries Defendants will conduct, including any inquiry conducted in connection with "this loan application."  No one would think it means what Defendants now pretend it means—that consumers explicitly agreed a soft inquiry could be done, and then somehow

-11-

also implicitly agreed that a subsequent hard inquiry would be performed only one screen later in the process.  *Nowhere* in the credit disclosure language do Defendants inform consumers that an additional credit pull may be done which ***will*** affect the consumers' credit scores.  (*See* Ou Decl., Ex. S.)  To the contrary, Defendants explicitly promised consumers on five separate occasions that any inquiries performed "will not affect [your/my] credit score."

The tortured language in Paragraph 43 of Ms. Ou's Declaration reveals the difficulty with Defendants' argument.  Faced with the plain language of her own website, the best Ms. Ou can say is that consumers were never explicitly promised that "Defendants will *only* 'make soft pull inquiries on them throughout their use of the website." (emphasis added).  What Ms. Ou conveniently neglects to acknowledge is that, while Defendants may not have used the word "only" on their website, as a factual matter the *only* disclosures Defendants ever made *all* stated that the inquiries that would be performed would be of a sort that would "not affect" Plaintiffs' credit scores.  The sophistry in Ms. Ou's Declaration is unavailing — while Defendants may not have said they would *only* do a soft pull, the *only* kind of pull Defendants ever said they *would do*, and the *only* kind of pull Plaintiffs ever consented to *allow* Defendants to do was the kind of "soft" pull that Defendants promised would "not affect" Plaintiffs' scores.  Ms. Ou's Declaration relies on a distinction without a difference.

ii.   Plaintiffs did not initiate a credit transaction with Defendants.

Recognizing the deficiencies with their consent argument, Defendants also claim they were allowed to conduct hard credit inquiries on Plaintiffs because Plaintiffs initiated a credit transaction.  This argument also fails.  Not only did Plaintiffs not "initiate a credit transaction" within the meaning of §§ 1681b(a)(3)(A) and b(3)(f), to the extent they did so, Defendants lacked a legitimate business need for the information pursuant to § 1681b(a)(3)(F)(i) because Defendants had explicitly (and falsely) represented that the only kind of credit inquiry that would be done would be a "soft" one which would "not affect"

-12-

Case 3:14-cv-05191-TEH   Document 80   Filed 09/25/15   Page 19 of 36

1   Plaintiffs' credit scores.

2       Defendants claim that § 1681b(a)(3)(A) of the FCRA has been interpreted as

3   requiring only that a credit transaction be initiated by the consumer in order for an end

4   user to have a permissible purpose under this section.   Leaving aside, for now, the

5   question of how Defendants' affirmative representations that only a soft pull would be

6   done in connection with "this loan application" affects this analysis, *but see § V.A.iii infra,*

7   Defendants' reliance on this section raises the question: what constitutes the initiation of a

8   credit transaction by a consumer?

9       The FTC answered this question in an advisory letter examining whether a car

10  dealership has a permissible purpose to run a credit check on a consumer who visits an

11  auto showroom and requests information about an automobile.  *See* Coffey Letter.[10]  The

12  FTC opined that "a request for general information about products and prices offered does

13  not involve a business transaction initiated by the consumer."   *Id.*   The letter further

14  elaborated that it would be permissible to obtain a consumer report "only in those

15  circumstances in which the consumer clearly understands that he or she is initiating the

16  purchase . . . *and* the seller has a legitimate business need for the consumer report

17  information."  *Id.* (emphasis added).

18      Plaintiffs' shopping behavior did not rise to the level of initiating a credit

19  transaction.   As the Coffey Letter states, a consumer who is merely "comparison

20  shopping" or "ask[ing] the dealer questions about prices or financing is not necessarily

21  indicating an intent to purchase…."  *Id.*   Plaintiffs were clearly engaged in the type of

22  comparison shopping that does not rise to the level of initiating a transaction.  Defendants

23  induced Plaintiffs to enter their website by promising low rates and inviting Plaintiffs to

24  check what rates and loan terms would be available to them.  Along with this invitation, in

25  _____

26  [10] "Federal Trade Commission staff opinion letters, while not authoritative guidance on
    the FCRA, may nonetheless serve as persuasive authority."  *Harris v. Home Depot U.S.A.,*

27  *Inc.*, No. 15-CV-01058-VC, 2015 WL 4270313, at *1 n.1 (N.D. Cal. June 30, 2015).

28                                    -13-

an effort to further induce consumers to shop on their website, Defendants promised that any credit inquiry "will not affect your credit score." (Ou Decl. Exs. F, G, S.) Tellingly, the pop-up window shown to Plaintiff Ahlborn just before the hard inquiry was done asked her to fill in the total amount of all her outstanding loans, not just the amount she was seeking to finance. It specifically allowed for the prospect that she was "considering" refinancing a smaller amount than the amount she was instructed to enter. On the webpage presenting partial terms for various loans options, Defendants state, "Select one of the below products to see how much you would save with a SoFi loan" further indicating that Defendants know consumers are still only comparison shopping. (Ou Decl. Ex. V.) It is directly at the bottom of this same screen where the button which Defendants use to trigger the hard credit pull appears. (*Id.*) Based on the information and language presented on Defendants' website, no reasonable consumer would "clearly understand[] that he or she is initiating" a transaction purely by viewing available rates and loan terms and trying to "see how much you would save."

iii.   <u>"Soft Inquiry Only" was a material term of any transaction.</u>

Even if Plaintiffs had unambiguously initiated a credit transaction with Defendants, an express material term of that transaction was that any credit inquiry conducted in connection therewith would "not affect [Plaintiffs'] credit score." The ability of parties to a transaction to negotiate terms relating to whether and when a credit check will be run is well established, and the parties' agreed terms trump any rights the creditor might otherwise enjoy. In *Scott v. Real Estate Fin. Grp.*, two brothers made an offer to lease a rental property but told the real estate broker that their offer was conditioned on the fact that no credit check would be run on them. 183 F.3d 97, 98-99 (2nd Cir. 1999). Despite the brothers' condition, the broker had an affiliate run credit checks on the brothers. *Id.* The Second Circuit reversed the district court's determination that the pending lease transaction created a permissible purpose for running the report. The appellate court recognized that the brothers had initiated a business transaction, but

-14-

found that because the brothers' participation in the transaction was conditioned on the owner's willingness to forego a credit check, there was no *legitimate* business need to run the report. *Id.* at 100. "In essence, the parties are free to contractually define whether or not a 'legitimate business need' exists 'in connection with a business transaction.'" *Id.*

A similar situation was presented in *Uhlig v. Berge Ford Inc.*, where a prospective car buyer conditioned the terms of the sale of the car on the fact that the dealership would not run a credit check on her. 257 F. Supp. 2d 1228, 1229-30 (D. Ariz. 2003). As in *Scott*, the dealership ran the credit check anyway. *Id.* The *Uhlig* court, comparing the factual circumstances of that case to the facts presented in *Scott* noted that "[i]f parties can contractually agree to what a 'legitimate business need' is, the court perceives no reason why they could not contractually agree as to whether any other purpose stated in section 1681b(a)(3) is permissible." *Id.* at 1233. On this basis, the court found that there was a genuine issue of material fact as to what the parties' agreement was with regard to whether a credit check would be run and denied summary judgment.

The facts of this case are even more compelling than those in either *Scott* or *Uhlig*. Here, it was *Defendants* who introduced the term of "will not affect your credit score" and who used the terms "soft pull" and "soft inquiry" in connection with what the Plaintiffs were authorizing.[11] It was also Defendants who wrote the credit disclosure,[12] which appeared on the same page as two separate statements stating the inquiry would "not affect [Plaintiffs'] credit." Notably, that disclosure stated that it applied for purposes of

---

[11] Defendants also argue that Plaintiffs "*expressly authorized* an inquiry with respect to a loan application, which is typically treated as a hard inquiry" by virtue of the language that appeared in the credit disclosure. (Defs.' Br. at 19 (emphasis in original).) No reasonable consumer would believe that generic language regarding credit checks that appeared directly below the words "Soft Credit Pull" and "will not affect [your/my] credit," and which made no explicit mention of a hard credit inquiry, was an authorization for a hard credit pull.

12 It is a general rule of contract interpretation that where a contract term is ambiguous or susceptible to more than one interpretation, the question should "be resolved against the party who prepared the writing." *InterPetrol Bermuda Ltd. v. Kaiser Alum. Int'l Corp.*, 719 F.2d 992, 998 (9th Cir. 1983).

1    "this application," clearly stating that the terms on that page all applied for purposes of the

2    entire application.   Plaintiffs simply consented to Defendants' unalterable terms and

3    proceeded with their loan shopping on the assumption that these terms would be honored.

4         Defendants disingenuously argue that "[t]he limitation could not have been a

5    material term of the parties' transaction if Defendants did not even know about it."

6    (Defs.' Br. at 19.)   This statement asks the Court to reach the absurd conclusion that

7    Defendants were unaware of the terms that appeared on their own website – terms that

8    they drafted.   Contrary to Defendants' claims, there was no need for Plaintiffs to

9    "expressly communicate [that term] to Defendants" because it was *Defendants* who

10   incorporated the terms into their website and who communicated these terms to Plaintiffs.

11   Plaintiffs are entitled to hold Defendants accountable for violating their own terms.

12        Each of the cases cited by Defendants in support of the proposition that a creditor

13   can conduct a credit inquiry even without the consumer's consent address only

14   circumstances where the creditor was not aware of the subjective intent of the consumer

15   that a report not be procured.   While the cases cited by Defendants may involve what

16   Defendants call the "consumer's private belief," this case does not.   *See*, *e.g. Newlin v.*

17   *Comcast Cable of Ind., Inc.*, 2014 WL 1207513, *2 (N.D. Ind. Mar. 24, 2014)

18   ("[a]lthough the evidence shows that the Plaintiff reasonably believed that Comcast would

19   not inquire about his credit, *it is insufficient to show that Comcast actually agreed to*

20   *these terms*") (emphasis added).   Here there is no need to ascertain what Plaintiffs'

21   subjective intent or "private belief" about the transaction was or whether Defendants were

22   aware of those beliefs, because an objective reading of the explicit language drafted by

23   Defendants shows that "will not affect your credit score" and "soft pull" and "soft

24   inquiry" and "for purposes of this application" were all material terms of the transaction,

25   and were all terms supplied by Defendants.   The only "private belief" that Plaintiffs had

26   relevant to the transaction was the belief that Defendants would honor the terms of the

27   agreement that Defendants drafted.   Unfortunately, Plaintiffs' trust in Defendants was

28

-16-

misplaced, and led to Plaintiffs filing the instant action.

### B.   Defendants Violated the FCRA and the CCRA By Obtaining Consumer Information Under False Pretenses.

Under the FCRA, a "user" of consumer information obtained from a consumer reporting agency is liable if that information was obtained through false pretenses.  15 U.S.C. § 1681q.  Contrary to Defendants' assertion, the fact that the FCRA's false pretenses provision is a criminal statute does not preclude civil liability for a violation of the provision.  (*See* Defs.' Br. at 29.)  In fact, the Ninth Circuit has specifically held that "§ 1681q does state a 'requirement imposed under this subchapter'… its violation therefore, forms a basis of civil liability under either § 1681n or § 1681o." *Hansen v. Morgan*, 582 F.2d 1214, 1219 (9th Cir. 1978).[13]

While the majority of the cases brought under 15 U.S.C. § 1681q involve misrepresentations and false statements made by an end user to a consumer reporting agency about the purposes for which it is procuring a consumer report, the statute does not foreclose liability for false statements made by an end user directly to a consumer.  The provision at issue here states:

> Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined under title 18, imprisoned for not more than 2 years, or both.

15 U.S.C. § 1681q.  Defendants argue that "section 1681q applies to the reasons the consumer report *user* gives to a *consumer reporting agency* in order to obtain a consumer report."  (Defs.' Br. at 21 (emphasis in original).)  However, nothing in the statute limits its application solely to this scenario.

Notably, all of the cases cited by Defendants involve false pretenses given to a consumer reporting agency by the user of consumer information.  In these circumstances it makes logical sense that "if a user obtains a consumer report for a 'permissible

---

[13] *See also Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 971-72 (4th Cir. 1987); *Zamora v. Valley Fed. Sav. & Loan Ass'n*, 811 F.2d 1368, 1370 (10th Cir. 1987); *Kennedy v. Border City Sav. & Loan Ass'n*, 747 F.2d 367, 369 (6th Cir. 1984).

-17-

purpose,' that user could not have obtained the report under 'false pretenses.'" *Pappas v. City of Calumet City*, 9 F. Supp. 2d 943, 949 n.3 (N.D. Ill. 1998). The logic in these cases is that it does not matter which of the many permissible purposes a user claims, so long as the user actually has a permissible purpose, the user will not be held liable for misrepresenting which specific permissible purpose it has. The point, in these cases, is that the user would have gotten the report anyway, so the user did not obtain the report as a result of the false pretense. The truth would have also entitled the user to the report.

However, this is not the situation presented by this litigation. Here, Defendants induced Plaintiffs to proceed with the loan shopping process by falsely stating that doing so "will not affect your credit score." Defendants referred to the inquiries as "soft" and stated that the disclosure applied for purposes of "this application." These false statements led to Defendants procuring Plaintiffs' credit reports on a hard inquiry basis under false pretenses which is the very thing that is explicitly prohibited by 15 U.S.C. § 1681q.

Defendants attempt to escape liability under the false pretenses provision of the CCRAA by claiming first that it "is not a substantive requirement of the CCRAA" and, second, that the provision only applies to "natural persons." (Defs.' Br. at 23.) The CCRAA's prohibition on procuring a consumer report under false pretenses appears in § 1785.31. The fact that § 1785.31 provides a remedy for "obtaining a consumer credit report under false pretenses" shows that this action is considered a violation of the statute. *See* Cal. Civ. Code § 1785.31(a)(3). Section 1785.31(a)(3) simply sets the remedy for violations by natural persons at $2,500. *Id.* Section 1785.31(b) makes it clear that injunctive relief is available for any violation under the act "whether or not the consumer seeks any other remedy under this section." *See* Cal. Civ. Code § 1785.31(b).

### C. The Issue of Willfulness Should Not Be Decided Now -- on a Partial Record, at Summary Judgment.

Despite Defendants' efforts to rewrite Supreme Court jurisprudence, the law is

-18-

1    clear that a willful violation of the FCRA encompasses either a knowing violation or a

2    reckless violation.   *See Safeco*, 551 U.S. at 57 ("[W]here willfulness is a statutory

3    condition of civil liability, we have generally taken it to cover not only knowing violations

4    of a standard, but reckless ones as well.").  Faced with bad facts, Defendants attempt to

5    portray the willfulness inquiry under the FCRA as being a qualified immunity analysis on

6    steroids and claim that because no court of appeals has yet held that it is illegal to lie to

7    consumers about whether a credit inquiry will affect their credit scores, they are free to do

8    as they wish.  Tellingly, courts in this District have explicitly rejected other defendants'

9    efforts to paint the law in this light.  *See Holman*, 2013 WL 4873496, at *6 ("Defendant

10   overstates the Safeco Court's reliance on qualified immunity analysis. Indeed, the Safeco

11   Court only mentions qualified immunity once, in a parenthetical to a citation introduced

12   by 'Cf.' See *Safeco*, 551 U.S. at 70 (citing *Saucier v. Katz*, 633 U.S. 194 (2001)).").

13        Rather, a company commits a reckless violation of the FCRA where its "action is

14   not only a violation under a reasonable reading of the statute's terms, but shows that the

15   company ran a risk of violating the law substantially greater than the risk associated with a

16   reading that was merely careless."  *Id.* at 69.  When considering whether defendants'

17   actions were in "reckless disregard" of a statute, courts must look to the statutory

18   language, guidance from other courts to consider the issue, and guidance from the

19   regulatory authorities charged with enforcement of the statute, in this case, the FTC.

20   *Lengel v. HomeAdvisor, Inc.*, ___ F. Supp. 3d. ___, 2015 WL 2088933, at *9 (D. Kan.

21   May 6, 2015) ("It is important to remember, despite comparisons made to qualified

22   immunity analysis, that this is not a question of whether a legal principle is clearly

23   established in constitutional jurisprudence where existing circuit court or Supreme Court

24   precedent is usually required. Instead, it is an issue of statutory interpretation where there

25   is a greater potential for the relevant text to provide clear guidance.") (internal citations

26   omitted).  And of course, contrary to *Safeco*, Defendants' view would read the prospect of

27   a "knowing" violation right out of the statute.

28

-19-

Critically, the Court need only reach the question of whether Defendants committed a reckless violation of the FCRA, if the Court finds insufficient evidence of a knowing violation.  Plaintiffs have alleged and have discovered substantial evidence that Defendants knowingly violated the FCRA and CCRAA.  A knowing violation ends the willfulness inquiry and defeats summary judgment.  Regardless of whether a reckless violation or a knowing violation occurred, willfulness is a fact-bound inquiry which is inappropriate for judgment at this stage and should be reserved for a jury, or, at a minimum, be postponed until discovery on this issue has been completed.[14]

i.   The evidence in the record shows that Defendants' violations were knowing.

At the summary judgment stage, when looking at the evidence presented, the court must draw all reasonable inferences in favor of the non-moving party.  *See Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Here, Plaintiffs have presented enough evidence of Defendants' knowing violation of the statutes at issue to defeat summary judgment on the issue of willfulness.  First, Defendants were aware of the responsibilities of a user of a credit report under the FCRA and CCRAA and had employed general counsel to advise them of these responsibilities.  (Yelle Decl. Ex. 8.) Defendants' employees testified that ███████████████████████████████████ ████████████████████████████ (McIntosh Dep. 48-52; Ou Dep. 124:16-24, 157:2-17.) ████████████████████████████████████████ (Yelle Decl. Ex. 9.) ███████████████████████████████████

---

[14] *See, e.g.*, *Manuel*, 2015 WL 4994538, at *18 ("Whether Wells Fargo acted willfully with respect to § 1681b(b)(2)(A) and § 1681b(b)(3) is a question of fact best reserved for a jury."); *Smith v. LexisNexis Screening Sols, Inc.*, 2014 WL 7403890, at *11 (E.D. Mich. Dec. 30, 2014) ("A mix of evidence pointing in different directions is precisely the reason the issue of willfulness is generally entrusted to the jury."); *Starkey v. Experian Info. Sols, Inc.*, 2014 WL 3809196 (C.D. Cal. Jan. 8, 2014) ("[w]illfulness under the FCRA is generally a question of fact for the jury.'"); *Edwards v. Toys "R" Us,* 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007) ("Willfulness under the FCRA is generally a question of fact for the jury.").

1  ████████████████████████████████████████████████████████

2  █████████████████████████ (Yelle Decl. Ex. 10.)

3           In addition to knowing that the FCRA applied, Defendants were also notified that

4  their actions were negatively affecting consumers.  Yet, Defendants chose not to change

5  their practices.  Defendants' own records, and the records of the BBB, show that dozens

6  of consumers, including Plaintiffs, had complained about Defendants' conduct, and about

7  the detrimental effect that Defendants' conduct had on their credit scores.  (SAC Exs. K,

8  M; Yelle Decl. Ex. 13, Ex. 5 at SOFI-00001233, 1260, 3646, 3657, 3688, 3699.)  Rather

9  than critically reviewing their loan shopping process, Defendants dismissed these

10  complaints and saw consumers as an annoyance.  (Yelle Decl. Ex. 5 at SOFI-00001260,

11  Ex. 6 at SOFI-00001584, 1592, Ex. 14.)

12          Defendants' motivation for not changing their policies was that they were

13  concerned that consumers would not use their site if consumers were aware that a hard

14  credit inquiry would be performed.[15] █████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  (Yelle Decl. Ex. 14.)

23          Tellingly, before either Plaintiff ever used Defendants' site, Defendants' website

24  included slightly clearer (yet still misleading) language about the fact of a credit inquiry.

---

[15] The credit disclosure used by one of Defendants' competitors, Earnest, gives consumers a clear picture of what credit inquiries will be done, at what point in the process each inquiry will be performed, and how these inquiries could affect consumers' credit scores. (Yelle Decl. Ex. 15.)

-21-

1    Specifically, Defendants' site used to state: "If you choose a product and apply for a loan

2    we will request your credit report from one or more credit bureaus."  (Yelle Decl. Ex. 16.)

3    However, Defendants removed this language because █████████████████████████████

4    ████████████████████████████████   Yelle Decl. Ex. 16; Ou Dep. 155:3-12.)

5         All of this evidence points to a *knowing* violation of the FCRA and CCRAA, in

6    which Defendants intentionally placed their business interests ahead of the rights of

7    consumers.  Given the fact bound nature of a willfulness determination, even this

8    incomplete record is enough to defeat Defendants' Motion.  At a minimum, Plaintiffs

9    should be allowed the opportunity to further investigate the evidence discovered thus far,

10   before the Court rules on this Motion.  (*See* Declaration of Megan D. Yelle Pursuant to

11   Fed. R. Civ. P. 56(d) ("56(d) Decl.") (detailing further discovery to be taken).)

12            ii.   <u>Defendants did not have a reasonable interpretation of the FCRA that
                  allowed their behavior.</u>

13        In order to have a viable "reasonable interpretation" defense, Defendants must

14   prove that they had a contemporaneous interpretation of the FCRA that would have

15   rendered their behavior allowable and that they acted in accordance with that

16   interpretation.[16]    *See Dunford*, 64 F. Supp. 3d at 1394-95 (finding defendant's

17

---

[16] Footnote 20 in *Safeco* rejects as irrelevant any evidence about how or why a given
18   interpretation was adopted.  But contrary to the holding of some courts, the footnote does
     not prohibit any inquiry into what the defendant's interpretation *actually was*.  Indeed, the
19   footnote assumes that defendant has *actually adopted* an interpretation:

20            Where, as here, the statutory text and relevant court and agency guidance
              allow for more than one reasonable interpretation, it would defy history
21            and current thinking to treat a defendant who merely *adopts* one such
              interpretation as a knowing or reckless violator. Congress could not have
22            intended such a result for those who *followed an interpretation* that could
              reasonably have found support in the courts, whatever their subjective
23            intent may have been.

24   *Safeco*, 551 U.S. at 70, fn. 20 (emphasis added).  Given the summary judgment posture of
     *Safeco*, the better reading of footnote 20 is that while discovery into the *reasons why* a
25   company adopted a particular interpretation is not allowed, determining what the
     company's interpretation of the statute *actually was* is required.  To read *Safeco* otherwise
26   would obliterate the prospect of a *knowing* violation, as a company whose actual
     interpretation of the law was that it forbade their actions could point to a reasonable
27   interpretation (that it never had) post-litigation which would have allowed their conduct

28
                                    -22-

1   understanding of the law "at the relevant time" to be critical in determining willfulness);

2   *Manuel*, 2015 WL 4994538, at *18 ("[W]hile Wells Fargo has pointed to several cases

3   that support its position, there is no evidence that anyone at Wells Fargo ever relied upon

4   those opinions in drafting its disclosure and waiver form.").  Defendants cannot simply

5   formulate a post-litigation interpretation of the statute that they deem to be "reasonable"

6   and use that interpretation to justify their pre-litigation behavior.  *See Claffey,* 494 F.

7   Supp. 2d at 978-79 ("[T]he 'objective' standard for recklessness that the Court adopted

8   does not render irrelevant evidence of the party's actual understanding of the law.").  To

9   allow Defendants to do so would render the recklessness inquiry toothless.

10      Defendants have presented no evidence of any contemporaneous statutory

11   interpretation or how that interpretation was applied.  *See Haley v. TalentWise, Inc.*, No.

12   13-cv-1915, 2014 WL 1648480, at *2 (W.D. Wash. Apr. 23, 2014) ("[D]etermining

13   whether TalentWise's interpretation is objectively reasonable would require factual

14   determinations (i.e., testimony from Talentwise's employees regarding Defendant's

15   interpretation)…."); *Singleton v. Domino's Pizza, LLC*, No. 11-cv1823, 2012 WL 245965,

16   at *9 (D. Md. Jan. 25, 2012) ("at present, there is no evidence that Domino's actually

17   adopted the interpretation of [the FCRA] that it proposes here.").  Instead, Defendants

18   have asserted the attorney-client and work product privileges and have refused to respond

19   to discovery regarding their pre-litigation interpretations of the statutes at issue.  (Yelle

20   Decl. Exs. 17 at RFP Nos. 14, 15, Ex. 18 at Obj. to Topic 4.)  Nor have they produced a

21   privilege log.  (56(d) Decl. ¶ 18.)

22      Defendants cannot use attorney-client privilege as both a sword and a shield by

23   arguing that they had a reasonable interpretation of the statutes at issue while, at the same

24   time, refusing to provide evidence or testimony regarding the basis for their interpretation.

25   As Judge Alsup recently noted in another FCRA case involving the question of

26   _____

   and thereby escape liability.

27

28

willfulness:

> An often-used gimmick in litigation is to refer to having used outside counsel to foster the impression that an accused wrongdoer was acting in good faith based on the advice of counsel—without waiving the privilege to allow the other side to learn the actual advice given and whether the party actually relied on it.

*Dunford*, 64 F. Supp. 3d 1378, 1395.   In an FCRA matter such as this, where the Defendants have invoked the attorney-client privilege with respect to what advice they received regarding the statutes at issue, the defendant is not entitled to argue that he had a reasonable statutory interpretation.   *Id.* (requiring defendant to elect to either waive privilege or abandon argument about reasonable interpretation of the FCRA).   *See also U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991) (upholding trial court's ruling that if defendant testified about his good faith belief he was following the law, he could not also invoke the privilege regarding what his attorneys told him because "[defendant's] testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue."); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (argument that defendants cannot use attorney client privilege as both a "sword" and a "shield" has merit).

           iii.    At a minimum, the Court should not decide the issue of willfulness without allowing for additional discovery.

Ultimately, the issue of willfulness is inextricably linked with the question of what Defendants knew, when they knew it, and what, if any, interpretation of the FCRA Defendants had.  Discovery in this case has only just begun and Plaintiffs have not yet had the opportunity to fully investigate the knowledge of the employees who dealt directly with Plaintiffs and handled Plaintiffs' and other putative class members' complaints.  In particular, Plaintiffs' discovery efforts have been stymied by Defendants' refusal to provide information regarding their contemporaneous interpretation of the FCRA and CCRAA under the guise of attorney-client privilege.  Plaintiffs' efforts have also been stymied by Defendants' refusal, until only six days before this filing, to produce evidence regarding consumer complaints they received.   (56(d) Decl. ¶ 3.)   If this Court is

-24-

1   unpersuaded that the evidence of Defendants' knowing violation is sufficient to defeat

2   summary judgment or that Defendants' failure to present evidence of a contemporaneous

3   interpretation of the FCRA while also claiming the attorney-client privilege precludes

4   summary judgment at this stage, Plaintiffs should be allowed the opportunity to conduct

5   further discovery including, but not limited to, bringing a motion to compel discovery

6   about Defendants' statutory interpretations withheld on the basis of attorney-client or

7   work product privilege.

8       If not denied outright, Defendants' Motion, as to willfulness, should be denied

9   pursuant to Fed. R. Civ. P. 56(d)(2).  The Court should not decide willfulness without a

10  full record and should allow Plaintiffs to conduct additional discovery on the issues

11  identified above and set forth in the 56(d) Declaration at ¶¶ 19-21.

12  ### D.    *Social Finance Cannot Escape Liability Simply Because SoFi Lending Signed the Contract with Experian.*

13

14      In a one paragraph argument, Defendants assert that because "SoFi procured no

15  credit reports" it cannot be held liable for the asserted violations the FCRA or CCRAA.

16  (Defs.' Br. at 13.)  The FCRA specifically confers obligations on "users" of consumer

17  reports, not just those who procure the reports.  15 U.S.C. § 1681q (providing liability for

18  "any consumer reporting agency or *user of information*…."); § 1681b(f) ("a person shall

19  not *use* or obtain a consumer report [for an impermissible purpose].").  Courts in several

20  jurisdictions have found liability for entities and individuals who used consumer reports

21  even when they were not the entity that procured the report.  *See, e.g.*, *Scott*, 183 F.3d at

22  99-100 (holding that a real estate broker could be liable for procuring a report without a

23  permissible purpose when a separate real estate group procured the report); *Daley v.*

24  *Haddonfield Lumber Inc.*, 943 F. Supp. 464 (D.N.J. 1996) (holding that a condominium

25  association board could be held liable under the FCRA for procuring a credit report under

26  false pretenses where a board member procured the report through his place of

27  employment).

28

There is a genuine issue of material fact regarding which entity was responsible for initiating the credit pulls.  Although SoFi Lending Corp. is the entity that is a party to the contract with Experian, there is evidence that it is *Social Finance's* computer program that actually sends the request to Experian, receives the consumer information from Experian, and compiles it in its databases.  (Ou Decl. ¶¶ 2-5.)

██████████

██████████

██████████

██████████ (Yelle Decl. Ex. 14.)

Conflicting declarations from Social Finance's Vice President of Engineering on the issue of how the pulls are initiated also leave a question as to which entity is ultimately responsible and raise a specter of doubt as to the credibility of the witness on this issue. *Compare* June 18, 2015 Ou Decl. ¶ 3 (ECF No. 49-18) ("*SoFi* uses individual consumer credit reports to determine 'pre-qualified' borrower specific loan terms.  *SoFi* obtains those credit reports from Experian….") *with* Sept. 11, 2015 Ou Decl. ¶ 3 ("*SoFi Lending* uses individual consumer credit reports to determine 'pre-qualified' borrower specific loan terms.  *SoFi Lending* obtains those credit reports from Experian….").  These questions preclude Social Finance from obtaining summary judgment on the FCRA and CCRAA violations.  *See S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978) ("The courts have long recognized that summary judgment is singularly inappropriate where credibility is at issue.  Only after an evidentiary hearing or a full trial can these credibility issues be appropriately resolved.").  Plaintiffs received the second Ou Declaration only at the time it was filed, two weeks before this response was due.  At a minimum, Plaintiffs should be allowed the opportunity to conduct further discovery into this issue and to re-depose June Ou in light of her self-contradiction.

### E.      *Defendants Violated the California Unfair Competition Law.*

The California Unfair Competition Law ("UCL") was enacted to "govern anti-

-26-

competitive business practices as well as injuries to consumers.'" *Boschma v. Home Loan Ctr.*, 198 Cal. App. 4th 230, 252 (2011). "The UCL's coverage is 'sweeping,' and its standard for wrongful business conduct is 'intentionally broad.'" *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) (citing *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006)). The statute "establishes three varieties of unfair competition – acts or practices which are unlawful, unfair, or fraudulent. An act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent." *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1168 (E.D. Cal. 2013) (citing *Berryman v. Merit Prop. Mgm't, Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)).

Defendants argue that Plaintiffs do not have standing to bring a claim under the UCL because they have "lost no money or property." However, Defendants misstate the standard for standing under the UCL and do not address the fact that Plaintiffs here have suffered a diminution in their credit scores as a result of Defendants' conduct which is a very real economic damage. In the alternative, Defendants argue that Plaintiffs cannot show that Defendants' business practices implicate one of the three prongs of the UCL: unfair, fraudulent or unlawful. As described in detail *supra at §§ II.A, II.B*, Defendants' statements regarding "this inquiry will not affect your credit score" were blatantly false, or at the least were highly misleading and unfair, and as described *supra at § V.B*, violated the law.

i.   Plaintiffs have standing to bring UCL claims.

Statutory standing under the UCL is satisfied when the plaintiff "has suffered an injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. The California Supreme Court has stated that there are "innumerable" ways a plaintiff can demonstrate "lost money or property." which include, but are not limited to, "(1) surrender[ing] in a transaction more, or acquir[ing] in a transaction less, than he or she otherwise would have; (2) hav[ing] a present or future property interest diminished; (3) be[ing] deprived of money or property to which he or she

-27-

has a cognizable claim; or (4) be[ing] required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885-86 (Cal. 2011). "[L]ost money or property" is synonymous with "economic injury." *Id.* at 885.

Defendants do not dispute that Defendants' hard credit inquiry diminished Plaintiffs' credit scores or negatively affected their credit reports. The evidence shows that Plaintiff Heaton's credit score dropped from 756 on July 5, 2014 to 717 on August 18, 2014. (*Compare* Yelle Decl. Ex. 19 p. 1 *with* p. 2.) The improper hard credit inquiry by Defendants done on July 9, 2014 is the only explanation for this drop in his credit score. The majority of courts that have considered the issue have held a decreased credit score, negative information in a credit report, or loss of access to credit are all sufficient to establish economic injury and confer UCL standing.[17] Black's Law Dictionary defines "economic injury" as "[a]n injury to a person's *ability* to enter into or profit from a business arrangement." "Injury," *Black's Law Dictionary* (10th ed. 2014) (emphasis added). Consumers with higher credit scores and unblemished credit reports have access to more favorable credit options, sources, and terms. Damage to credit worthiness via a lower credit score or negative information in a credit report thus injures a person's ability to enter into a business arrangement. Here, Plaintiffs were at least temporarily deterred from procuring new sources of credit due to the damage to, and fear of further damage to, their credit reports.

---

[17] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010); *Venugopal v. Digital Fed. Credit Union*, 2013 WL 1283436, at *5 (N.D. Cal. Mar. 27, 2013); *Rex v. Chase Home Fin. LLC*, 905 F. Supp. 2d 1111, 1147 (C.D. Cal. 2012); *White v. Trans Union, LLC*, 462 F. Supp. 2d 1079, 1084 (C.D. Cal. 2006); *Alborzian v. JPMorgan Chase Bank, N.A.*, 185 Cal. Rptr. 3d 84, 92 (Cal. Ct. App. 2015); *see also Velasquez v. Chase Home Fin. LLC*, 2010 WL 3211905, at *7 (N.D. Cal. Aug. 12, 2010); *Dampf v. BAC Home Loans Servicing, L.P.*, 2014 WL 5369782, at *14 (Cal. Ct. App. Oct. 22, 2014).

-28-

1

ii.   Defendants' misrepresentations constitute an unfair, fraudulent, and/or unlawful business practice.

2

     Parroting their earlier arguments, Defendants once again assert that they could not

3

have violated the law because they did not make any "unfair" or "fraudulent"

4

representations. As a factual matter, and as Plaintiffs have explored fully in sections II.A

5

and II.B *supra*, Defendants strain credibility by failing to acknowledge the statements they

6

made and posted on their own website. Claiming that the credit disclosure appearing

7

directly below the heading "Soft Pull" and the words "will not affect your credit score"

8

was meant to inform consumers of a separate credit inquiry that would affect their credit

9

score is the very definition of "unfair" and "fraudulent." Defendants had a responsibility

10

not to mislead consumers with false and misleading statements regarding credit inquiries.

11

Yet, on every occasion where Defendants' website mentions credit inquiries, the phrase

12

"will not affect your credit score" also appears.

13

     Defendants' argument also fails as a legal matter. "A fraudulent business practice

14

is one in which members of the public are likely to be deceived." *Morgan v. AT&T*

15

*Wireless Srvs, Inc.*, 177 Cal. App. 4th 1235, 1254 (2009) (internal citations omitted).

16

Under the fraudulent prong of the UCL, courts have held "[a] reasonable consumer

17

standard applies when determining whether a given claim is misleading or deceptive."

18

*Herron*, 924 F. Supp. 2d at 1172 (citing *Colgan v. Leatherman Tool Grp.*, 135 Cal.

19

App.4th 663, 682 (2006)). Applying this standard, courts have held that the allegedly

20

fraudulent statement does not have to be untrue on its face if it is likely to mislead a

21

reasonable consumer. *Id.* ("Thus a statement that 'may be accurate on some level but will

22

nonetheless tend to mislead or deceive' is actionable under the UCL" (citing *Boschma*,

23

198 Cal. App.4th at 253); *Morgan*, 177 Cal. App. 4th at 1255 (holding that liability exists

24

for "perfectly true statement[s] couched in such a manner that it is likely to mislead or

25

deceive the consumer, such as by failure to disclose other relevant information . . ..").  As

26

evidenced by numerous consumer complaints, Defendants' claims that any inquiry "will

27

not affect your credit score" meet this standard.

28

-29-

Three separate tests have developed to determine whether a business practice is "unfair" under the UCL.[18]   Defendants do not address any of these three tests in their memorandum.  (*See* Defs.' Br. at 29-30*.*)  Instead, Defendants simply assert that they did not make any false representations.  (*Id.* at 1.)  This unsubstantiated claim is insufficient to win summary judgment on this issue.  At a minimum, there is a genuine issue of material fact as to whether Defendants' practices meet any of these three standards.

For all the reasons stated *supra* § V.E.i, Defendants have engaged in an unlawful business practice which creates liability under the UCL by violating both the FCRA and the CCRAA.  *See Cel-Tech*, 20 Cal. 4th at 180 (stating that the statute "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.") (internal quotations omitted).

## VI.     CONCLUSION

This Court should deny Defendants' Motion for Summary Judgment or, in the alternative, defer a ruling on the Motion until further discovery has been taken consistent with Plaintiffs' Rule 56(d) Declaration.

Dated: September 25, 2015                       NICHOLS KASTER, PLLP
                                                By: /s/Megan D. Yelle
                                                     Megan D. Yelle (*pro hac vice*)
                                                ATTORNEY FOR INDIVIDUAL AND
                                                REPRESENTATIVE PLAINTIFF

---

[18] Under one line of cases, "unfairness" under the UCL requires "that the public policy which is a predicate to a consumer unfair competition action . . . must be tethered to specific constitutional, statutory, or regulatory provisions." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (citing *Cel-Tech Comms., Inc. v. Los Angeles Cell. Tele. Co.*, 20 Cal. 4th 163, 187 (Cal. 1999)).  Under a second line of cases, the test is whether the business practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh in on the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.*  A final line of cases "draws on the definition of 'unfair' in section 5 of the Federal Trade Commission Act (15 U.S.C. § 45 subd. n) and requires that (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoid." *Id.*